## IN THE COURT OF COMMON PLEAS
## SUMMIT COUNTY, OHIO

| | | |
|---|---|---|
| PAUL THOMARIOS<br>1 Thomarios Way<br>Akron, Ohio 44321 | ) <br> ) <br> ) <br> ) | CASE NO.<br><br>JUDGE |
| Plaintiff, | ) <br> ) | |
| v. | ) <br> ) | **COMPLAINT** |
| EXACTECH, INC.<br>c/o Its Statutory Agent<br>Corporation Service Company<br>3366 Riverside Drive, Suite 103<br>Upper Arlington, Ohio 43221 | ) <br> ) <br> ) <br> ) <br> ) <br> ) | **(JURY DEMAND ENDORSED HEREON)** |
| and | ) <br> ) | |
| EXACTECH US, INC.<br>c/o Its Statutory Agent<br>Corporation Service Company<br>3366 Riverside Drive, Suite 103<br>Upper Arlington, Ohio 43221 | ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| Defendants. | ) | |

EXHIBIT
**A**

Now comes Plaintiff, PAUL THOMARIOS, by and through his undersigned counsel, and hereby submits this Complaint and Jury Demand against EXACTECH, INC. and EXACTECH US, INC. for compensatory and punitive damages, equitable relief, and such other relief deemed just and proper arising from the injuries suffered as a direct and proximate result of Defendants' designing, testing, assembling, selecting, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting and/or selling the defective devices sold under the name "Optetrak" Total Knee System and/or "Optetrak Logic" Total Knee System (hereinafter, "Optetrak").  In support, Plaintiff alleges the following:

## I.   NATURE OF CAUSE OF ACTION

1. This case involves claims of strict product liability, failure to warn, breach of express and implied warranties, fraud and negligence in the designing, testing, assembling, selecting, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting and/or selling the defective Optetrak devices by the Defendants directly through their agents, apparent agents, servants and/or employees.

2. Defendants promoted their Optetrak devices as a system with three decades of clinical success and proven outcomes for patients around the world because of an improved articular design resulting in low polyethylene stress, and due to their proprietary polyethylene materials, which they claimed minimized wear and lead to increased longevity.

3. On February 7, 2022, Defendants initiated a recall to include "all knee and ankle arthroplasty polyethylene inserts packaged in non-conforming bags" that were sold since 2004.

4. On February 7, 2022, Defendants sent surgeons a letter explaining that they conducted "extensive testing" and confirmed that most of their inserts manufactured since 2004 were packaged in "out-of-specification" or "non-conforming" vacuum bags that did not contain the necessary "secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance." Due to this deficiency, Defendants conceded the following:

> The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, and/or component fatigue cracking/fracture, all leading to corrective revision surgery.

(Ex. A.)

2

5. On March 15, 2021, Plaintiff PAUL THOMARIOS underwent Total Knee Replacement surgery on his left knee, in which an Optetrak device was implanted.

6. In the years following the surgery, Plaintiff PAUL THOMARIOS experienced pain, swelling, instability and bone loss caused by early and accelerated polyethylene wear and/or component loosening. It is anticipated that Plaintiff will require an extensive revision surgery as a result.

7. Recipients of the Optetrak knee implants have required painful revision surgeries well before the estimated life expectancy of the devices, and at a much higher rate than should reasonably be expected for devices of this kind.

8. Until February 7, 2022, Defendants concealed their knowledge of the Optetrak devices' unreasonably dangerous risks, including an increased risk of early failure, from Plaintiff, Plaintiff's medical providers, other consumers, and the medical community at large.

9. Despite knowledge that the Optetrak devices were defective and result in premature failure and accompanying complications, Defendants continued to aggressively market and sell the Optetrak devices, all the while maintaining that these devices were safe and effective for use in total knee replacements and concealing the hazards posed by these defective devices.

## PARTIES

10. Plaintiff PAUL THOMARIOS is an individual residing in Summit County in the State of Ohio.

11. Defendant EXACTECH, INC. is a for-profit Florida Corporation doing business in the State of Ohio with its principal place of business at 2320 NW 66th Court, Gainesville, Florida, 32653 and can be served through its registered agent, Corporation Service Company,

3

1201 Hays Street, Tallahassee, FL 32301-2525. Defendant EXACTECH, INC.'s stated purpose is to "develop, manufacture, market, distribute and sell orthopedic implant devices, related surgical instrumentation and biologic services to hospitals and physicians in the United States and internationally" and to introduce its products, including the Optetrak device, into interstate commerce, either directly or indirectly through third parties or related entities. At all times relevant to this action, Defendant EXACTECH, INC. tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed and/or sold the Optetrak devices in interstate commerce and throughout the State of Ohio and generated substantial revenue as a result.

12.    Defendant EXACTECH US, INC., a wholly owned subsidiary of Defendant, EXACTECH, INC., is a for-profit Florida corporation with is principal place of business at 2320 NW 66th Court, Gainesville, Florida, 32653 and can be served through its registered agent, Corporation Service Company, 3366 Riverside Drive, Suite 103, Upper Arlington, OH 43221. According to public filings, Defendant, EXACTECH US, INC. conducts Defendant EXACTECH, INC.'s sales and distribution activities in the United States. Defendant, EXACTECH US, INC., is engaged in the business of designing, developing, testing, assembling, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting, selling, and introducing its products, including the Optetrak devices, into interstate commerce, either directly or indirectly through third parties or related entities. At all times material to this action, Defendant EXACTECH US, INC. tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed and/or sold the Optetrak device in interstate commerce and throughout the State of Ohio and generated substantial revenue as a result.

4

13.    EXACTECH US, INC. is thus also an agent, representative and/or alter ego of Defendant EXACTECH, INC.  Collectively, EXACTECH, INC. and EXACTECH US, INC. are referred to herein as "EXACTECH" or "Defendants."

14.    At all times material to this action, each of the Defendants and their directors and officers acted within the scope of their authority of each Defendant and on behalf of each other. At all times material to this action, Defendants possessed a unity of interest between themselves and exercised control over their subsidiaries and affiliates.  As such, the Defendants are each individually, as well as jointly and severally, liable to Plaintiff for Plaintiff's injuries, losses, and damages as described herein.

## JURISDICTION AND VENUE

15.    This Court maintains general personal jurisdiction over Defendants as they purposely engaged in the business of designing, developing, selecting, testing, assembling, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting, selling, and introducing into interstate commerce, their products, including the Optetrak devices and other Exactech implants, within the State of Ohio, with a reasonable expectation that the products would be used within this County.

16.    The Court maintains personal jurisdiction over the parties and subject matter jurisdiction over the causes of action alleged herein because the defective device at issue was implanted within this County.

17.    At all times material to this action, Defendants were engaged in disseminating inaccurate, false and/or misleading information about the Optetrak devices to healthcare professionals in the State of Ohio, including Plaintiff's healthcare professionals, with a reasonable expectation that such information would be used and relied upon by healthcare

5

professionals throughout the State of Ohio, including but not limited to:

    a.    false representations of duration and survival of the components lasting longer than other knee implants because of proprietary use of materials and processes to give it superior wear characteristics; and/or,

    b.    false claims of greater forgiveness to sub-optimal implantation conditions.

18. Defendants derived substantial revenue and benefit from their business activities within the State of Ohio, including the promotion, sale and use of Optetrak devices.

19. Therefore, this Court has both specific and general jurisdiction over all named defendants.

20. Venue is proper in this Court because Defendants have substantial, systematic and continuous contacts in the State of Ohio and this County, and because Defendants are subject to personal jurisdiction within the State of Ohio and this County.

## FACTS

21. The knee is the largest joint in the human body, consisting of three individual bones: the shin bone (tibia), the thigh bone (femur) and the knee cap (patella). The knee joint is lined with cartilage to protect the bones from rubbing against each other. This ensures that the joint surfaces can glide easily over one another. The human knee is a complicated joint which supports the entire body weight on four small surfaces through a variety of motions essential to everyday life. It is the joint most susceptible to arthritis.

22. With the increases in lifespan, people have begun to suffer pain and disability from knee joint arthritis at significant rates. Total knee arthroplasty ("TKA"), also called total knee replacement ("TKR"), is a surgical procedure intended to relieve pain, improve joint function, and replace bones, cartilage and/or tissue that have been compromised by arthritis, other diseases, or trauma. The knee replacement implants designed and cleared in the 1990s met

6

the goals of reducing pain and restoring function with low failure rates.  As TKAs became more common, particularly among younger patients who want to maintain a physically active lifestyle, alternative bearing surfaces such as cross-linked polyethylene have been developed to address the issue of wear.

23.    During TKA procedures, surgeons replace the joint surfaces and damaged bone and cartilage with artificial materials, such as the Optetrak device.  The femoral implant is placed into the distal femur using surgical bone cement.  The tibial tray is also placed with surgical bone cement.  A polyethylene insert or liner is placed between the femoral implant and tibial tray to act as a cushion between the components.  The replacement redistributes weight and removes the tissue and/or bone causing inflammation, and thus reduces pain while improving the joint's function.  Replacement requires a mechanical connection between the bones and the implant components.

24.    The first Optetrak knee device was introduced to orthopedic surgeons in the United States in 1994.

25.    Since 1994, Defendants have obtained 501(k) clearance from the United States Food and Drug Administration ("FDA") for various versions of Optetrak devices and tibial inserts, including Optetrak PS, Optetrak Hi-Flex PS, Optetrak Finned Tibial Tray, Optetrak Offset Tibial Tray, Optetrak RBK Tibial Insert, Optetrak RBK Tibial Tray, Optetrak CR Slope, and Optetrak Logic.

26.    At all times material, Defendants designed, developed, tested, assembled, selected, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, warranted, and/or sold the Optetrak devices throughout the United States.

27.    The Optetrak devices are classified as knee joint patellofemorotibial cemented

*Tavia Galonski, Summit County Clerk of Courts*

protheses.  They feature a mix of polyethylene and metal-based components.

28.    The Optetrak devices are comprised of the following component parts: a patellar cap, femoral cap, tibial insert and tibial tray.

29.    The patellar cap and tibial insert are made of polyethylene.

30.    Defendants promoted the Optetrak system as being first in class in their product brochures.

31.    However, upon information and belief, by 2007 at the latest, the Defendants began receiving numerous reports regarding extremely high failure rates of the Optetrak devices, which required patients to undergo premature knee revisions.

32.    Between 2007 and 2008, the Defendants performed an internal investigation through which they determined that the Optetrak devices had material design flaws based on verified reports from surgeons using the devices.  The internal investigation further determined that there were engineering and design process failures that the Defendants attributed to the device failures.

33.    Around 2008, the Defendants determined that the Optetrak Total Knee System posed a safety risk to patients due to various defects in the implant, including substantial problems with the Optetrak Tibia "Finned" Tray.

34.    Beginning in 2011, the Exactech Defendants began silently replacing the "finned" tibia tray with a "fit" tibia tray and change of the polyethylene insert.

35.    In studies published in 2012 and 2016, the Optetrak total knee system performed poorly when compared to its competitors.  *See,* Thelu, C. et al., Orthopedics and Traumatology 2012; 98:413-420; *see also*, Australian Orthopaedic Association, National Joint Replacement Registry, Hip Knee & Shoulder Arthroplasty, 2016 Annual Report.  The Australian Registry, a

8

preeminent, internationally recognized orthopedic implant registry, identified the Optetrak as an implant with a higher-than-expected rate of revision.

36.    Defendants promoted the Optetrak devices as having nearly three decades of clinical success and proven outcomes for patients around the world owing to an improved articular design resulting in low polyethylene stresses.

37.    At all relevant times, Defendants were aware of the high rate of early failures of Optetrak devices that required patients to undergo painful revision surgeries to remove the defective device and replace it with another product.

38.    Despite having actual knowledge of the increased risk of failure related to the defective nature of the Optetrak devices, Defendants made the decision not to recall, stop selling, or otherwise change the warnings for the affected devices until there was s suitable replacement approved for the U.S. market.

39.    Despite Defendants' knowledge of the high rate of early onset failures of the Optetrak devices, Defendants continued to manufacture, package, promote, and distribute the Optetrak devices without alerting surgeons of the potential increased risks of early onset failures of the device.

40.    Despite Defendants' knowledge of the high rate of early onset failures of the Optetrak devices, Defendants continued to manufacture, package, promote, and distribute the Optetrak devices without changing, modifying, or improving the devices or their packaging to address the increased risk of early failure.

41.    Despite Defendants' knowledge of the high rate of early onset failures of the Optetrak devices, Defendants did not change the labeling, marketing materials or product inserts to adequately and accurately warn patients or physicians of the associated increased risks,

*Tavia Galonski, Summit County Clerk of Courts*

longevity, and alternative product options with lower risks and lower rates of early failure.

42.      Despite Defendants' knowledge of the high rate of early onset failures of the Optetrak devices, Defendants did not even fully alert the FDA of the known increased risks until February 7, 2022.

43.      At all times material to this action, Defendants were aware of the problems with the Optetrak devices' design and their propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.  Nonetheless, Defendants failed to adequately warn patients, the medical community, or the public about these risks and continued to promote, market, sell, and defend the Optetrak devices without limitation until February 7, 2022.

44.      On February 7, 2022, Defendants issued a Recall of their knee and ankle implants, sending an "URGENT MEDICAL DEVICE CORRECTION" Notice to "Exactech Knee and Ankle Surgeons, Hospitals, [and] Health Care Professionals" to alert them to the defects in their knee and ankle arthroplasty polyethylene inserts.  The Notice explained that all three generations of Exactech knee systems had polyethylene inserts packaged in "non-conforming bags", stating specifically:

> The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer.  Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, and/or component fatigue cracking/fracture, all leading to corrective revision surgery.

45.      The Notice also acknowledged that the Optetrak devices demonstrated

10

statistically significant higher overall revision rates compared to other knee systems in the Australian, United Kingdom, and New Zealand registries. In fact, the Notice admits that the reasons for revision potentially associated with polyethylene wear (e.g. loosening, lysis, pain) were increased three- to seven-fold in the most used Exactech Optetrak TKR combination (Optetrak-PS/Optetrak) which had a total of 263 TKR revision procedures among 2,410 primary TKRs when compared with other TKRs in the Australian Registry.

46.    Defendants also prepared a sample letter for physicians to send their patients, which explains the defect in their products as follows:

> During a recent review of its knee implant manufacturing process, Exactech learned that one of the packaging layers for the plastic insert has been out of specification and may allow oxygen from the air to diffuse into the plastic inserts prior to it being implanted into your knee. If a large amount of oxygen diffuses into the plastic insert while it's being stored and before implanted, this can lead to a process called oxidation, which can cause the plastic to wear out earlier than expected or to become damaged after it is implanted into the patient's body.

(Ex. B.)

47.    The FDA classified Defendants' recall as a class II recall meaning that exposure to the product may cause temporary or medically reversible health consequences.

48.    An example of a medically reversible health consequence is a revision surgery.

49.    On March 15, 2021, Plaintiff PAUL THOMARIOS underwent a left TKR at Crystal Clinic, Inc. in Akron, Ohio, which is located in Summit County. The surgery was performed by Dr. Gradisar.

50.    During the procedure, a defective Optetrak device was implanted in Plaintiff's left knee cavity, including among other components, an Optetrak Logic tibial insert made of polyethylene.

11

51.     The arthroplasty was done correctly and did not deviate from accepted medical custom and practice with regards to the implantation of the Optetrak device.

52.     Defendants designed, developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, warranted and/or sold the defective implants placed inside Plaintiff PAUL THOMARIOS' knee cavity.

53.     After an initial recovery period and for a period of years thereafter, Plaintiff's Optetrak devices performed as expected.

54.     However, Plaintiff began to experience swelling in and around the knee.  He began to suffer from stiffness and discomfort in the knee joint, which progressed in severity. Plaintiff suffered from grinding and popping, increased pain and instability.

55.     Upon information and belief, the Optetrak device implanted in Plaintiff's knee is defective and is progressively failing prematurely.

56.     Upon information and belief, the Optetrak device implanted in Plaintiff's knee is suffering from loosening secondary to osteolysis secondary to polyethylene war, which is one of the precise concerns expressed by Defendants in their communications to implanting surgeons.

57.     Upon information and belief, the polyethylene inserts used in the Optetrak device implanted in Plaintiff's knee is defective, leading to early aseptic loosening.  A packaging defect in the packaging containing the Optetrak polyethylene inserts accelerated polyethylene wear due to oxidation.

58.     Upon information and belief, the defective polyethylene substance used in the Optetrak devices, and/or the defective or non-conforming packaging of said devices, caused and/or contributed to accelerated polyethylene wear leading to early failure of the implant in Plaintiff's knee.

59.    Upon information and belief, the defective Optetrak devices were defective in their design, manufacturing and materials at the time they left Defendants' hands and were delivered into the stream of commerce in their defective condition.

60.    It was foreseeable, expected and intended, by the Defendants that the defective Optetrak devices would be used in a knee arthroplasty patient, such as PAUL THOMARIOS.

61.    Defendants allowed the defective Optetrak device to be implanted during Plaintiff's total knee arthroplasty in said condition.

62.    Defendants failed with respect to the selection of materials, processes, testing, quality audits, and supervision of the manufacturing of their knee implant devices, including the defective Optetrak device implanted in Plaintiff's knee.

63.    As a direct and proximate result of the deficiencies in the defective Optetrak devices described herein, Plaintiff PAUL THOMARIOS has suffered and will continue to suffer injuries and damages, including without limitation the following: pain, instability, fear and apprehension of requiring a painful future revision surgery, failure of the implant, having future medical care and monitoring of the implant, and having experienced and will continue to experience prolonged and lasting pain and suffering and loss of enjoyment of life.

## COUNT I
**(STRICT PRODUCTS LIABILITY: MANUFACTURING DEFECT, R.C. 2307.71 *et seq.*)**

64.    Plaintiffs restate and reallege the foregoing paragraphs 1-63 of this Complaint as if fully rewritten herein at length.

65.    Defendants had a duty to manufacture and package the Optetrak devices in a manner that prevents unreasonable risk of harm or injury to users and patients, including Plaintiff.

66.    Defendants had a duty to distribute, market, and/or sell the Optetrak devices

13

*Tavia Galonski, Summit County Clerk of Courts*

without manufacturing defects to prevent an unreasonable risk of harm or injury to users and patients, including Plaintiff.

67. The defective Optetrak devices manufactured by the Defendants were not reasonably safe for their expected, intended, and/or foreseeable uses, functions and purposes.

68. The defective Optetrak devices were not reasonably safe as manufactured, packaged, distributed, marketed and/or sold by Defendants.

69. The defective Optetrak devices were defectively manufactured and packaged for a multitude of reasons, including but not limited to the following:

    a. The polyethylene substance within the defective Optetrak devices was of an inferior grade or quality than that advertised and promoted by the Defendants;

    b. Defendants packaged the defective Optetrak devices in out-of-specification or non-conforming vacuum bags that did not contain secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance;

    c. The polyethylene substance within the defective Optetrak devices was not made using the molding process advertised and promoted by the Defendants;

    d. The polyethylene substance within the defective Optetrak devices did not comply with the required specifications for the polyethylene inserts that should be used in the devices;

    e. The polyethylene inserts used in the defective Optetrak devices were not of the correct shelf age;

    f. Defendants failed to perform quality control or other such testing on the polyethylene inserts used in the defective Optetrak devices to ensure they complied with required specifications;

    g. Defendants failed to exercise sufficient quality control to ensure the polyethylene inserts in the defective Optetrak devices were safe for implantation in users and patients and would not degrade abnormally under intended, average and regular use.

70. Defendants knew or should have known and been aware that the defective

14

CV-2024-02-0508    MCCARTY, ALISON E.    01/31/2024 15:27:15 PM    CMCO    Page 15 of 45

Optetrak devices were defectively manufactured and/or packaged.

71. The defective Optetrak devices were defective in their manufacturing, materials, and packaging at the time they left the Defendants' hands, and they were delivered into the stream of commerce in their defective condition.

72. The defective Optetrak devices should not have been distributed, marketed, and/or sold by Defendants in a defectively manufactured and/or defectively packaged condition.

73. It was foreseeable, expected and intended by the Defendants for the defective Optetrak devices to be used in the knee arthroplasty patient, such as Plaintiff.

74. The manufacturing and packaging defects of the defective Optetrak devices presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when used and operated for the purposes intended by Defendants.

75. The manufacturing and packaging defects of the defective Optetrak devices presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when they were used and operated in a manner that was foreseeable to Defendants.

76. Defendants breached their duty to manufacture and package the Optetrak devices in a manner that eliminated and/or prevented an unreasonable risk of harm or injury to users and patients exposed to their damage, including Plaintiff.

77. Defendants breached their duty to distribute, market and/or sell the Optetrak devices without manufacturing and packaging defects to eliminate or prevent an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

78. Plaintiff was seriously injured as a result of the manufacturing and packaging defects in the Optetrak devices caused by Defendants.

79. Defendants are strictly liable for the defective manufacture and/or defective

Tavia Galonski, Summit County Clerk of Courts

packaging of the defective Optetrak devices; the distribution, marketing, and/or sale of the defectively manufactured Optetrak devices; and the injuries sustained by Plaintiff.

80.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff was implanted with a defective device and has suffered severe and debilitating injuries, and other damages, including but not limited to, cost of medical care, rehabilitation, permanent physical injury and damage, including instability, loss of balance, and immobility, as well as pain and suffering, for which he is entitled to in an amount to be proven at trial.

## COUNT II
### (STRICT PRODUCTS LIABILITY: DESIGN DEFECT, R.C. 2307.71, *et seq.*)

81.     Plaintiff restates and realleges the foregoing paragraphs 1- 80 of this Complaint as if fully rewritten herein at length

82.     Defendants had a duty to design the defective Optetrak devices in a manner that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

83.     Prior to, on, and after the dates of Plaintiff's initial knee surgeries, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak devices for implantation into consumers, such as Plaintiff, by physicians and orthopedic surgeons in the United States.

84.     The Optetrak devices were defective in design and unreasonably dangerous when they entered the stream of commerce and were received by Plaintiff, because the risks were outweighed by any utility of the design of the devices and because the devices were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.  At no time did Plaintiff have reason to believe that the Optetrak devices were in a condition not suitable for their

16

proper and intended use.

85.     The Optetrak devices were defective in design and unreasonably dangerous when they entered the stream of commerce and were received by Plaintiff, because the foreseeable risks exceeded or outweighed the purported benefits associated with the device.

86.     At all times relevant to this action, the Defendants tested studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak devices, which were implanted in Plaintiff such that they were dangerous, unsafe, and defective in design

87.     The Optetrak devices implanted in Plaintiff were defective in design by virtue of their size, shape, length, diameter, surface, finish, molecular weight, post-consolidation treatment or lack thereof, and/or other material properties that cause the devices to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries, as well as the need for revision surgery in patients, and cause or contribute to a higher failure rate and/or shorter useful life expectancy than comparable knee replacement products.

88.     The design of the packaging in which the Optetrak device components are contained is defective and not reasonably safe.

89.     Plaintiff's physicians employed the Optetrak devices in the manner in which they were intended to be used, making such use reasonably foreseeable to Defendants.

90.     The Optetrak devices as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

91.     At all times mentioned, the Defendants tested, studied, researched, designed,

17

formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak devices, which were implanted in Plaintiff, such that they were dangerous, unsafe, and defective. The defects in design include but are not limited to the following respects:

a.    that the Optetrak has propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients;

b.    that the components of the Optetrak were packaged in improperly designed vacuum bags that did not contain secondary barrier layer containing ethylene vinyl alcohol (EVOH) to prevent oxidation;

c.    that the materials used within the Optetrak were of an inferior grade or quality than advertised and promoted by Defendants;

d.    that the Defendants failed to conduct adequate mechanical testing, including wear or other testing, on components, subassemblies and/or the finished Optetrak;

e.    that Defendants failed to test an adequate number of samples of Optetrak devices on an ongoing basis;

f.    that Defendants failed to take adequate steps to specifically identify failure modes with the Optetrak with clarity and to suggest methods to monitor, avoid and/or prevent further failures;

g.    that Defendants failed to take corrective actions to eliminate or minimize further failures of the Optetrak devices.

92.    As alleged herein, Defendants knew and had reason to know that the Optetrak caused an increased risk of harm to the Plaintiff and other consumers due to the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other premature failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients. Defendants consciously disregarded this increased risk of harm by failing to adequately warn of the risk; unlawfully concealing the

18

dangerous problems associated with implantation of the Optetrak; and continuing to market, promote, sell and defend the Optetrak devices.

93.     It was foreseeable, expected and intended by the Defendants for the defective Optetrak devices to be used in a knee arthroplasty patient, such as Plaintiff.

94.     The design defects of the Optetrak devices presented an unreasonable risk of harm when they were used and operated for purposes expected and intended by Defendants.

95.     The design defects of the Optetrak and Optetrak packaging present an unreasonable risk of harm when they were used in a manner that was or should have been foreseeable to Defendants.

96.     Pre-existing feasible safer alternative designs providing the same functional purpose were available to the Defendants at the time the Optetrak devices and Optetrak packaging were designed and offered for sale in the market.

97.     Defendants failed to balance the feasibility of safer alternative designs for the Optetrak and Optetrak packaging against existing risks of injury.

98.     Defendants failed to use their own pre-existing feasible safer alternative designs providing the same functional purpose.

99.     Defendants failed to take into account the reasonable cost of feasible safer alternative designs.

100.     Defendants failed to balance the risk of injury against the utility and costs of feasible safer alternative designs.

101.     Defendants failed to develop feasible safer alternative designs providing the same functional purpose with reasonable price adjustments.

102.     Defendants failed to take into account improvements related to safety and injury

19

prevention presented by feasible safer alternative designs.

103.    Defendants failed to consider foreseeable safety hazards and serious injury risks arising from the Optetrak device's design.

104.    Defendants breached their duty to design the Optetrak devices in a manner that eliminates or prevents an unreasonable risk of harm or injury.

105.    As alleged herein, the defects in design of the Optetrak were a substantial factor in causing Plaintiff's injuries.

106.    Plaintiff was seriously injured as a result of the design defects in the Optetrak devices.

107.    Defendants are strictly liable for the defective design of the Optetrak; the distribution, marketing, and/or sale of the defectively designed Optetrak devices; and the injuries sustained by Plaintiff as a result thereof.

108.    Defendants' conduct as described herein was a proximate cause of Plaintiff's injuries and damages.

## COUNT III
### (STRICT PRODUCTS LIABILITY: FAILURE TO WARN, R.C. 2307.71, *et seq.*)

109.    Plaintiff restates and realleges the foregoing paragraphs 1- 108 of this Complaint as if fully rewritten herein at length

110.    At all times relevant to this action, Defendants tested studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak devices for implantation into consumers, such as Plaintiff, by physicians and orthopedic surgeons in the United States.

111.    The Optetrak device was defective and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff because the risks were outweighed by any

utility of the design of the device and because the device was dangerous to an extent beyond that which would be contemplated by the ordinary consumer.  At no time did Plaintiff have reason to believe that the Optetrak device was in a condition not suitable for its proper and intended use.

112.    The Optetrak device was defective and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff because the warnings in the instructions for use, operative techniques, directions, marketing and promotional materials, advertisements, white papers, and other communications provided by Defendants or their sales force to physicians and patients with or about the Optetrak failed to adequately convey the potential risks and side effects of the Optetrak device and the dangerous propensities of the device, which risks were known or were reasonably knowable to Defendants.  In particular, Defendants failed to adequately disclose the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients where risks exceeded or outweighed the purported benefits associated with the device.

113.    The Optetrak device was defective and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff cause the Optetrak device posed increased risks of harm and side effects that were known or knowable to Defendants by the use of available scientific knowledge.

114.    Defendants knew or should have known of the defective condition, dangerous characteristics, and risks associated with the Optetrak device as alleged herein.

115.    Defendants consciously disregarded the increased risks of harm by failing to adequately warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the Optetrak; and continuing to market, promote, sell and defend the Optetrak.

*Tavia Galonski, Summit County Clerk of Courts*

116. The Optetrak device that was manufactured, distributed, and sold by the Defendants to Plaintiff was in a defective condition that was unreasonably dangerous to any user or ordinary consumer of the device, including Plaintiff.

117. Such ordinary consumers, including Plaintiff, would not and could not have recognized or discovered by the exercise of reasonable care, the defects mentioned herein and perceived their danger.

118. Defendants, as manufacturers and/or distributors of the Optetrak devices, are held to the level of knowledge of an expert in the field.

119. The warnings that were given by the Defendants were not accurate, clear, and/or were ambiguous.

120. The Optetrak device was expected to and did reach Plaintiff and Plaintiff's healthcare providers without substantial change in its condition as manufactured, packaged, distributed and sold by Defendants.

121. Plaintiff, individually and through Plaintiff's physicians, reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

122. Defendants had a continuing duty to warn Plaintiff of the dangers associated with Optetrak devices.

123. Had Plaintiff received adequate warnings regarding the risks of the Optetrak device, Plaintiff would not have used it or allowed her surgeon to implant it in his body.

124. Plaintiff's healthcare providers stored, handled, and used the Optetrak device in the manner in which it was intended to be stored, handled and used, making such use reasonably foreseeable to Defendants.

125. The lack of adequate and accurate warnings in the instructions for use, operative

22

techniques, directions, marketing and promotional materials, advertisements, white papers, and other communications provided by Defendants or its sales force to physicians and patients with or about the Optetrak device prior to, on, and after the date of Plaintiff's initial knee surgeries were a substantial factor in causing Plaintiff's injuries, losses and damages as alleged herein.

126.    Defendants failed to develop and make available alternative products that were designed in a safe or safer manner, even though such products were feasible and marketable and, in fact, were being sold and marketed by Defendants and/or other manufacturers at the time Defendants sold the Optetrak device to Plaintiff.

127.    Defendants' conduct as described herein was a proximate cause of Plaintiff's injuries and damages.

### COUNT IV
**(NEGLIGENCE, R.C. 2307.74, *et seq.*)**

128.    Plaintiff restates and realleges the foregoing paragraphs 1- 127 of this Complaint as if fully rewritten herein at length.

129.    Defendants had a duty to exercise reasonable care in the design, manufacture, packaging, sale and/or distribution of Optetrak devices into the stream of commerce, including a duty to assure that their products did not pose a significantly increased risk of bodily harm and adverse events and/or a duty to comply with federal requirements.

130.    Defendants breached their duty and failed to exercise ordinary care in the design, formulation, manufacture, packaging, sale, testing, quality assurance, quality control, labeling, marketing, promotions, and distribution of Optetrak devices into interstate commerce in that Defendants knew or should have known that the product caused significant bodily harm and was not safe for use by consumers and/or through failure to comply with federal requirements.

131.    Defendants failed to exercise due care under the circumstances, and their

*Tavia Galonski, Summit County Clerk of Courts*

negligence and recklessness includes the following acts and omissions:

a. Negligently manufacturing, or failing to select appropriate third-parties to produce, the polyethylene components used in the Optetrak devices;

b. Negligently packaging, or failing to select appropriate third-parties to package, the polyethylene components used in the Optetrak devices;

c. Negligently failing to properly supervise and monitor the production and packaging of the polyethylene components used in the Optetrak devices;

d. Negligently failing to properly and thoroughly select the material used in the Optetrak devices;

e. Negligently failing to properly and adequately test the Optetrak devices and their attendant parts before releasing the devices to market;

f. Negligently failing to conduct sufficient post-market testing and surveillance of the defective Optetrak devices;

g. Negligently failing to adequately prevent, identify, mitigate, and fix defective designs and hazards associated with the defective Optetrak devices in accordance with good practices;

h. Negligently designing, manufacturing, packaging, marketing, advertising, distributing, and selling the Optetrak devices;

i. Continuing to negligently manufacture and distribute the defective Optetrak devices after the Defendants knew or should have known of their adverse effects and/or the increased early onset failure rates; and

j. Negligently violating applicable state and federal laws and regulations.

132. Despite the fact that Defendants knew or should have known that the Optetrak devices posed a serious risk of bodily harm to consumers Defendants continued to manufacture and market devices for use by consumers and/or continued to fail to comply with federal requirements.

133. Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above, including the failure to comply with federal requirements.

24

134.    As a direct and proximate result of Defendants' negligence, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss into the future.

135.    Defendants' conduct as described herein was a proximate cause of Plaintiff's injuries and damages.

**COUNT V**
**(NEGLIGENT MISREPRESENTATION, R.C. 2307.77, *et seq.*)**

136.    Plaintiff restates and realleges the foregoing paragraphs 1- 135 of this Complaint as if fully rewritten herein at length.

137.    At the time Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak devices to Plaintiff and/or Plaintiff's healthcare providers, Defendants knew or should have known of the use for which the devices were intended and the serious risks and dangers associated with such use of the Optetrak devices.

138.    Defendants owed a duty to orthopedic surgeons, other healthcare providers and to consumers of the Optetrak devices, including Plaintiff, to accurately and truthfully represent the risks of the Optetrak device.  Defendants breached their duty by misrepresenting and/or failing to adequately warn Plaintiff's healthcare providers, the medical community, Plaintiff, and the public about the risks of the Optetrak device, including the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients, which Defendants knew or in the exercise of diligence should have known.

139.    Among Defendants' numerous misrepresentations and misleading omissions are

25

Defendants' assurances that the Optetrak device was safe, had an excellent performance record, and did not have a greater propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revisions surgery in patients. Instead, and in Plaintiff's case, Defendants stated or implied to physicians, patients and the FDA that any problem with the Optetrak devices in a particular patient was attributable to "surgical technique" or patient factors such as body mass index, bone composition, and post-implantation activity level. Defendants made such statements even after they became aware of numerous and serious complications with the Optetrak device. Defendants did not reveal (and instead concealed) their knowledge of numerous and serious complications and other bad data during their meetings with orthopedic surgeons and the FDA.

140. Despite their knowledge of serious problems with the Optetrak device, Defendants urged their sales representatives to continue marketing the Optetrak device, and distributed medical literature, white papers, non-peer reviewed studies, and other communications to physicians in an effort to mislead them and the general public about the risks associated with the Optetrak device and instead create the image and impression that the Optetrak device was safe.

141. Defendants' conduct as described herein was a proximate cause of Plaintiff's injuries and damages.

## COUNT VI
### (FRAUDULENT MISREPRESENTATION, R.C. 2307.77)

142. Plaintiff restates and realleges the foregoing paragraphs 1-141 of this Complaint as if fully rewritten herein at length.

143. Defendants, having undertaken to test, study, research, design, formulate,

26

manufacture, inspect, label, package, promote, advertise, market, distribute and sell the Optetrak device, owed a duty to provide accurate and complete information to Plaintiff, her healthcare providers, and the public regarding the safety and efficacy of the Optetrak.

144. However, Defendants misled Plaintiff, Plaintiff's healthcare providers, and the public into believing that the Optetrak device was safe and effective for use in total knee replacement surgery and engaged in deceptive, misleading and unconscionable promotional, marketing and sales tactics to convince healthcare providers and patients to use the Optetrak, even though Defendants knew or should have known that the Optetrak was unreasonably dangerous as alleged herein. Defendants also failed to warn healthcare providers and the public about the serious risks associated with the use of the Optetrak including the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

145. Defendants' advertising campaigns, marketing materials and promotional items, by containing affirmative misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the Optetrak was safe for human use and had no unacceptable risks.

146. Defendants purposefully concealed, failed to disclose, misstated, downplayed and understated the risks associated with the use of the Optetrak device. Defendants, through sales representatives, advertisements, and other marketing and promotional practices and communications as well as through the publication of medical literature and non-peer reviewed studies, deceived healthcare providers, Plaintiff, other patients, and the public about the true risks of the Optetrak device. Defendants falsely and deceptively kept relevant information from

27

healthcare providers, the FDA and the public, including Plaintiff, regarding the safety of the Optetrak.

147.   Defendants expressly denied that the Optetrak created an unreasonable, increased risk of injury and took affirmative steps to prevent the discovery and dissemination of any evidence regarding the increased likelihood of injury from the Optetrak device including but not limited to the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

148.   Defendants did not accurately report the results of adverse events by fraudulently and intentionally withholding from the FDA, healthcare providers, Plaintiff and the public, the truth regarding Optetrak's failures for years, all the while undertaking sales, marketing and promotional campaigns to sell the Optetrak.   Defendants received reports of defects in its Optetrak devices from various sources, including those alleged herein, and intentionally withheld this information from the FDA, healthcare providers, Plaintiff and the public, while continuing to sell the Optetrak for implantation in patients such as Plaintiff.

149.   Further, even as Defendants disclosed some information regarding the Optetrak device's defects, the disclosures were inadequate, incomplete, and misleading.

150.   Through their wrongful conduct, Defendants effectively deceived and misled the scientific and medical communities regarding the risks and benefits of the Optetrak device. Defendants failed to fully inform healthcare providers, Plaintiff, other patients, and the public of the true risks associated with the Optetrak, which were known to Defendants, and continued to assure healthcare providers and patients that the Optetrak was safe and effective device for the purpose of continuing to derive substantial profits from its sale.

28

151. Through their advertising campaigns, sales, and marketing materials and promotional items, Defendants falsely and deceptively misrepresented and omitted numerous material facts regarding the Optetrak, including but not limited to the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

152. Defendants possessed evidence demonstrating the Optetrak caused serious injuries. Nevertheless, Defendants continued to market the Optetrak by providing false and misleading information about the device's safety and efficacy to Plaintiff and Plaintiff's healthcare providers.

153. Among Defendants' numerous misrepresentations and misleading omissions to Plaintiff, Plaintiff's healthcare providers, and the public were Defendants' assurances that the Optetrak was a safe device and had a low failure rate. Defendants stated or implied to orthopedic surgeons that any problem with the Optetrak in a particular patient was attributable to "surgical technique" or patient factors such as body mass index, bone composition, and post-implantation activity level. Defendants made such statements even after they became aware of numerous and serious complications with the Optetrak Device. Defendants did not reveal (and instead concealed) their knowledge of numerous and serious complications and other bad data during their meetings with orthopedic surgeons.

154. Despite their knowledge of the risks with the Optetrak, Defendants urged their sales representatives to continue marketing it and distributed medical literature, non-peer reviewed studies, and other communications to healthcare providers which did not adequately convey the risks of the device in an effort to mislead them and the public about the serious risks

*Tavia Galonski, Summit County Clerk of Courts*

associated with its use.

155.   Defendants engaged in all the acts and omissions alleged herein with the intent that Plaintiff and Plaintiff's healthcare providers would rely on the misrepresentations, deceptions, and concealments in deciding to implant and use the Optetrak rather than another product.

156.   Plaintiff and Plaintiff's healthcare providers justifiably relied to their detriment on Defendants' intentional and fraudulent misrepresentations and this reliance proximately caused Plaintiff's injuries and damages as alleged herein.

157.   Plaintiff's healthcare providers relied upon information obtained from Defendants, the medical literature, journal articles, medical conferences and presentations, adverse event reporting data, and discussions with other healthcare providers to get information about the performance and safety profile of medical devices including the Optetrak device. However, all these sources of information failed to include information about the true risks of the Optetrak device because these risks, which were known to Defendants, were actively concealed or misrepresented by Defendants.

158.   Had Defendants disclosed accurate, complete, and truthful information about the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients, Plaintiff would not have allowed her physician to implant the Optetrak device into her body.

159.   Defendants' conduct as herein alleged was a proximate cause of Plaintiff's injuries and damages.

## COUNT VII
### (FRAUDULENT CONCEALMENT)

30

Case 1:24-cv-01957-NGG-MMH    Document 1-1    Filed 03/01/24    Page 31 of 50 PageID #: 38

160. Plaintiff restates and realleges the foregoing paragraphs 1-159 of this Complaint as if fully rewritten herein at length.

161. At all times during the course of dealing between the Defendants, Plaintiff, Plaintiff's healthcare providers, and/or the FDA, the Defendants misrepresented the safety of Optetrak devices for their intended use.

162. Defendants knew or were reckless in not knowing that their representations were false.

163. In representations to Plaintiff, Plaintiff's healthcare providers, and/or the FDA, the Defendants fraudulently concealed and intentionally omitted material information, including but not limited to the facts that:

    a.    the subject product was not as safe as other similar devices indicated for knee arthroplasty;

    b.    that the subject product was defective, and that it caused dangerous side effects, including but not limited to component loosening, component mal-alignment, substantial early polyethylene wear, pain, irritation and discomfort, as well as the need for additional procedures to remove and replace the device, notwithstanding the Defendants' knowledge of an increased risk of these injuries and side effects versus other knee arthroplasty devices;

    c.    that the subject product was manufactured and/or packaged negligently;

    d.    that the subject product was manufactured and/or packaged defectively;

    e.    that the subject product was manufactured and/or packaged improperly;

    f.    that the subject product and/or product packaging was designed negligently;

    g.    that the subject product and/or product packaging was designed defectively; and

    h.    that the subject product and/or product packaging was designed improperly.

31

164.    Defendants were under a duty to disclose to Plaintiff, Plaintiff's healthcare providers, and/or the FDA the defective nature of the Optetrak device, including but not limited to the risk of the device's propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries, as well as the need for revision surgery in patients.

165.    Defendants had sole access to material facts concerning the defective nature of the subject product and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who used Optetrak devices, including Plaintiff.

166.    Defendants' concealment and omissions of material facts concerning, inter alia, the safety of the Optetrak devices was made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiff and Plaintiff's physicians, hospitals, and healthcare providers into reliance on the use of the devices, and to cause them to purchase, prescribe, dispense and/or use the subject product.

167.    Defendants knew that Plaintiff, Plaintiff's healthcare providers, and/or the FDA had no way to determine the truth behind the Defendants' concealment and omissions, as set forth herein.

168.    Plaintiff, as well as Plaintiff's physicians, healthcare providers, and/or hospitals, reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by the Defendants.

169.    Defendants' conduct as described herein was a proximate cause of Plaintiff's injuries and damages.

## COUNT VIII
### (BREACH OF EXPRESS WARRANTY)

32

170. Plaintiff restates and realleges the foregoing paragraphs 1-169 of this Complaint as if fully rewritten herein at length.

171. At all times material to this action, Defendants manufactured, packaged, distributed, recommended, merchandized, advertised, promoted, and sold the Optetrak devices. These actions were under the ultimate control and supervision of Defendants.

172. Defendants expressly represented and warranted that Optetrak devices were safe and effective devices for those patients requiring a knee replacement.

173. Optetrak devices manufactured, packaged, and sold by Defendants did not conform to these express representations and warranties because they caused serious injury to the Plaintiff when used as recommended and directed.

174. Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue.

175. The Optetrak device was injected into the stream of commerce by Defendants in a defective, unsafe, and inherently dangerous condition, and the product's materials were expected to and did reach users, handlers, and persons encountering said products without substantial change in the condition in which they were sold.

176. Plaintiff and Plaintiff's healthcare providers relied on Defendants' express representations and warranties about the safety and efficacy of the Optetrak device.

177. Plaintiff and Plaintiff's healthcare providers reasonably relied upon the skill and judgment of Defendant as to whether the Optetrak was of merchantable quality and safe and fit for its intended use.

178. Defendants' conduct as described herein was a proximate cause of damages to Plaintiff.

33

## COUNT IX
### (BREACH OF IMPLIED WARRANTY)

179.    Plaintiff restates and realleges the foregoing paragraphs 1-178 of this Complaint as if fully rewritten herein at length.

180.    At all times material to this action, the Defendants manufactured, packaged, distributed, recommended, merchandized, advertised, promoted, and sold the Optetrak devices. These actions were under the ultimate control and supervision of Defendants.

181.    At the time Defendants designed, manufactured, packaged, marketed, sold, and distributed the Optetrak device for use by the Plaintiff, Defendants knew of the use for which the Optetrak device was intended, impliedly warranted the product to be of the use for which the Optetrak device was intended, impliedly warranted the product to be of merchantable quality and safe for such use, and that its design, manufacture, packaging, labeling, and marketing complied with all applicable federal requirements.

182.    These representations and warranties were false, misleading, and inaccurate in that the Optetrak device was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

183.    Defendants knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue.

184.    Plaintiff and Plaintiff's healthcare providers relied on Defendants' implied representations and warranties about the safety and efficacy of the Optetrak devices.

185.    The Plaintiff and Plaintiff's healthcare providers reasonably relied upon the skill and judgment of Defendants as to whether the Optetrak device was of merchantable quality and safe for its intended use, and upon Defendants' implied warranty as to such matters, including that it was in compliance with all federal requirements.

34

186.   The Defendants breached the aforesaid implied warranties, as its Optetrak device was not fit for its intended purposes and uses.

187.   Contrary to Defendants' implied warranties, the Optetrak device was not of merchantable quality or safe for its intended use, because the product was defective as described above, and/or it failed to comply with federal requirements.

188.   Defendants' conduct as described herein was a proximate cause of damages to Plaintiff.

## COUNT X
## (VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT)

189.   Plaintiff restates and realleges the foregoing paragraphs 1-188 of this Complaint as if fully rewritten herein at length.

190.   Plaintiff PAUL THOMARIOS alleges that he is a Consumer entitled to the protections of the Consumer Sales Practices Act, R.C. § 1345.01, *et seq*., int hat he received the Optetrak device as manufactured, marketed and supplied by Defendants.

191.   Defendants supplied Plaintiff PAUL THOMARIOS's medical providers with the product, and accordingly are suppliers in connection with consumer transactions pursuant to R.C. § 1345.01 *et seq*.

192.   Defendants deceived Plaintiff in violation of R.C. § 1345.02(A) of the Act by promoting, soliciting, effecting and/or allowing sales with the use of unfair, false, misleading, or deceptive acts or practices to Plaintiff, either directly or indirectly through his medical providers.

193.   Defendants engaged in deceptive acts and practices pursuant to R.C. § 1345.02(B)(2) as a supplier in connection with consumer transactions in that Defendants knew at the time that the transactions were entered into that it deceptively represented that the Optetrak device was of a particular standard, quality and grade or prescription.

35

194.    Defendants engaged in unconscionable acts and practices pursuant to R.C. § 1345.03(B)(6).

195.    Defendants knowingly accepted the benefits of its deceptive acts in the form of increased profits from increased sales.

196.    Defendants should have taken affirmative steps to warn consumers, such as Plaintiff PAUL THOMARIOS, and/or his prescribing physicians, of the potential harm of the Optetrak device.

197.    As a direct and proximate result of Defendants' deceptive and unconscionable acts and practices, Plaintiff PAUL THOMARIOS, has suffered injuries and damages described herein.

198.    Plaintiff PAUL THOMARIOS further alleges that Defendants knowingly committed acts and practices in violation of the Ohio Consumer Sales Practices Act and is accordingly responsible for attorneys' fees.

## COUNT XI
### (PUNITIVE DAMAGES)

199.    Plaintiff restates and realleges the foregoing paragraphs 1-198 of this Complaint as if fully rewritten herein at length.

200.    Plaintiff is entitled to an award of punitive and exemplary damages based on the Defendants' intentional, willful, knowing, fraudulent, malicious acts, omissions, and conduct, and their complete and total disregard of the health, safety and welfare of the public and in particular Plaintiff, PAUL THOMARIOS.

201.    The Defendants had knowledge of, and were in possession of, evidence demonstrating that the Optetrak device was defective, unreasonably dangerous, and had a substantially higher failure rate than did other similar devices on the market. Despite their

36

knowledge, the Defendant failed to, among other purposeful acts, inform or warn Plaintiff, Plaintiff's agents, or his healthcare providers of the dangers, establish and maintain an adequate quality and post-market surveillance system, and recall the Optetrak device from the market sooner.

202.    As a direct and proximate result of the Defendants' acts and omissions as set forth herein, Plaintiff has suffered and will continue to suffer serious physical injuries, pain and suffering, mental anguish, medical expenses, loss of enjoyment of life, disability and other losses, in an amount to be determined at trial.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally, as follows:

(a)    For damages in a sum in excess of $25,000.00 for

1.    Physical pain and suffering in the past and which, in reasonable probability he will continue to suffer in the future;

2.    Physical impairment and incapacity in the past and which, in reasonable probability he will continue to suffer in the future;

3.    Mental anguish in the past and which, in reasonable probability, he will sustain in the future;

4.    Reasonable and necessary medical expenses for treatment received in the past and, based upon reasonable medical probability, the expenses to be incurred in the future;

5.    Damages under the Ohio Consumer Practices Act; and,

6.    Punitive damages.

37

(b)     Plaintiff be awarded full, fair and complete recovery for all claims and causes of action as alleged herein;

(c)     Plaintiff be awarded all appropriate costs, fees, expenses, pre-judgment interest and post-judgment interest in accordance with the laws of the State of Ohio; and,

(d)     Such other relief this Court deems just and proper.

Respectfully submitted,

*/s/ William J. Novak*
WILLIAM J. NOVAK (0014029)
**NOVAK, LLP**
P.O. Box 1228
Bath, Ohio 44210
P. (216) 781-8700
F. (330) 666-5266
william@novak-law.com

*/s/ Colin P. Sammon*
COLIN P. SAMMON (0076011)
**Sammon Law, LLC**
4931 Shady Brooke Run
Medina, Ohio 44256
P. (216) 978-3308
F. (216) 916-4905
colin@sammonlaw.com

*Attorneys for Plaintiff*

## JURY DEMAND

A trial by jury is hereby requested on all matters herein.

Respectfully submitted,

*/s/ Colin P. Sammon*
**COLIN P. SAMMON (0076011)**

*One of the Attorneys for Plaintiffs*

38



HEADQUARTERS
2320 NW 66TH COURT
GAINESVILLE, FL 32653 USA
📞 +1 352.377.1140
🖶 +1 352.378.2617

# ***URGENT MEDICAL DEVICE CORRECTION***

Monday, February 7, 2022

To:        Exactech Knee and Ankle Surgeons, Hospitals, Health Care Professionals

Description:   Exactech Ultra-High Molecular Weight Polyethylene (UHMWPE) Knee and Ankle
Polyethylene Inserts packaged in out-of-specification vacuum bags:

| System | Component Description | Marketing Dates | Phase 1 Recall Units (US) | Phase 2 Recall Units (US) | Implanted units in US since 2004 |
|---|---|---|---|---|---|
| OPTETRAK® | OPTETRAK® All-polyethylene CR Tibial Components<br>OPTETRAK® All-polyethylene PS Tibial Components<br>OPTETRAK® CR Tibial Inserts<br>OPTETRAK® CR Slope Tibial Inserts<br>OPTETRAK® PS Tibial Inserts<br>OPTETRAK® HI-FLEX® PS Tibial Inserts | Introduced in the United States in 1994. | 211 | 491 | 60,926 |
| OPTETRAK Logic® (referred to as "Logic" below) | OPTETRAK Logic® CR Tibial Inserts<br>OPTETRAK Logic® CR Slope Tibial Inserts<br>OPTETRAK Logic® CRC Tibial Inserts<br>OPTETRAK Logic® PS Tibial Inserts<br>OPTETRAK Logic® PSC Tibial Inserts<br>OPTETRAK Logic® CC Tibial Inserts | Introduced in the United States in 2009. | 2,861 | 602 | 60,518 |
| TRULIANT® | TRULIANT® CR Tibial Inserts<br>TRULIANT® CR Slope Tibial Inserts<br>TRULIANT® CRC Tibial Inserts<br>TRULIANT® PS Tibial Inserts<br>TRULIANT® PSC Tibial Inserts | Introduced in the United States in 2017. | 5,144 | 53,207 | 24,727 |
| VANTAGE® | VANTAGE® Fixed-Bearing Liner Component | Introduced in the United States in 2016. | 518 | 3,461 | 1,561 |



EXHIBIT

A

Page 1 of 4

*Tavia Galonski, Summit County Clerk of Courts*



**HEADQUARTERS**
2320 NW 66TH COURT
GAINESVILLE, FL 32653 USA

📞 +1 352.377.1140
📠 +1 352.378.2617

Dear Exactech Surgeon,

The purpose of this letter is to provide an important update on the status of our knee and ankle arthroplasty polyethylene inserts and the recall we initiated on August 31, 2021 and important recommendations for surgeons.

After extensive testing, we have confirmed that most of our inserts manufactured since 2004 were packaged in out-of-specification (referred to hereafter as "non-conforming") vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance. **The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, and/or component fatigue cracking/fracture, all leading to corrective revision surgery.**

Exactech is now expanding the recall to include all knee and ankle arthroplasty polyethylene inserts packaged in non-conforming bags **regardless of label or shelf life**. During the period between August 2021 and January 2022, non-conforming knee and ankle devices have been shipped and implanted by surgeons. In later sections of this letter, we will describe how surgeons can access lists of all their patients who have been implanted with non-conforming devices. FDA has classified this field action as a class II recall, meaning that exposure to the product may cause temporary or medically reversible health consequences or where the probability of serious health consequences is remote.

The design of these systems has evolved over time, but the UHMWPE materials have been consistent. More specifically, all three of these generations of Exactech knee systems have had polyethylene inserts packaged in non-conforming bags at various points during their respective market tenures. The original Optetrak Knee system, introduced in 1992, has shown statistically significant higher overall revision rates as compared to other TKA's in the Australian, United Kingdom and New Zealand registries. The data cited below do not include data on the Logic or Truliant knee systems.

The Australian Registry reported a total of 374 TKR revision procedures among 3,684 primary Optetrak TKRs with up to 14- to 20-years follow-up for each prosthesis combination. Every Exactech Optetrak TKR polyethylene component combination demonstrated statistically significant increased revision rates compared to other TKR systems (N=668,852) with at least one and a half years of follow-up with hazard ratios ranging from 1.84 to 5.85 (p<0.001)[1,4-7]. The United Kingdom Registry reported that the Exactech Optetrak TKR System utilizing the cruciate retaining femoral component (N=1,638) had statistically significant increased cumulative revision rates compared to all TKRs (N=1,145,052) at the 3, 5, 10, 13 and 15-year timepoints.[2] The New Zealand Registry reported a total of 63 TKR revision procedures among 661 primary Optetrak TKRs. The Optetrak TKR revision rate was 1.015/100 component years compared to all other primary TKRs (N=118,430) which had a revision rate of 0.48/100 component years and represented a statistically significant value greater than a two-fold increased revision rate.[3]

*Tavia Galonski, Summit County Clerk of Courts*

Case 1:24-cv-01957-NGG-MMH    Document 1-1    Filed 03/01/24    Page 41 of 50 PageID #: 48



Additionally, the reasons for revision potentially associated with polyethylene wear (e.g., loosening, lysis, pain) were increased three- to seven-fold in the most used Exactech Optetrak TKR combination (Optetrak-PS/Optetrak) which had a total of 263 TKR revision procedures among 2,410 primary TKRs when compared to other TKRs in the Australian Registry[4]. The reasons for these increased revision diagnoses related to accelerated polyethylene wear may be related to the non-conforming packaging.

We are uncertain if the root cause of these Optetrak higher and earlier than expected revision rates are due only to the non-conforming vacuum bags. The uncertainty in assessing the root cause stems from the fact that the registry data of the Optetrak Knee System report outcomes for polyethylene components in both conforming and non-conforming packaging, and the registries do not contain packaging information.

Exactech ankle arthroplasty systems have been represented by one implant system, marketed since 2017, and known as the Vantage® Total Ankle system. As described above, polyethylene inserts for the Vantage system have been packaged in non-conforming bags.

Please be advised that beginning in August 2021, Exactech recalled product with a labeled 8-year shelf-life that would have a shelf life of 5 years or greater as of August 31, 2022. Exactech is expanding the recall to include the remaining 55,269 non-conforming Exactech Knee and Ankle Ultra-High Molecular Weight Polyethylene (UHMWPE) inserts in the field, regardless of shelf life. There are approximately a total of 147,732 inserts implanted in the US since 2004 that were produced with non-conforming packaging.

Exactech is advising surgeons to avoid implanting nonconforming devices. A list of product codes, product description and serial numbers can be found at: https://www.exac.com/recall. Your agent will work with you to remove non-conforming devices from inventory. Additionally, we are requesting all conforming and non-conforming devices be returned to Exactech. We will sort and work to provide you with complete sets of conforming inserts as quickly as possible.

For all patients historically implanted with polyethylene devices in non-conforming bags, surgeons should maintain an appropriate index of suspicion for patients with any new or worsening pain, inability to bear weight, grinding or other noise, swelling, or instability in their knee or ankle . Note that registry data suggests that the reasons for revision related to accelerated UHMWPE wear in the most used prosthesis combination (Optetrak-PS/Optetrak) were increased 3- to 7-fold compared to all other TKR systems.[4] The reasons for these increased revision diagnoses related to accelerated polyethylene wear may be related to the non-conforming packaging.

In addition, Exactech recommends that surgeons closely monitor the affected knee and ankle patients for potential wear, osteolysis, and associated failure modes, regardless of polyethylene shelf-life and regardless of the time period that has elapsed since index arthroplasty. If a failed device is suspected, consider performing X-rays to further evaluate the device. Pre-emptive removal of non-painful, well-functioning Exactech knee and ankle devices from asymptomatic patients is not recommended. Decisions about removing or exchanging the device should be made by health care providers in consultation with the patient or caregiver on a case-by-case basis. As part of shared decision-making, discuss the benefits and risks of all relevant treatment options for painful arthritic knee and ankle joints with your patients.

For patients who exhibit premature polyethylene wear, the surgeon should consider revision surgery per their clinical judgment. If the surgeon desires to perform an isolated polyethylene exchange, Exactech can provide new polyethylene knee or ankle inserts that are packaged in conforming vacuum bags that contain the specified secondary EVOH oxygen barrier layer.

*Tavia Galonski, Summit County Clerk of Courts*



**HEADQUARTERS**
2320 NW 66TH COURT
GAINESVILLE, FL 32653 USA
+1 352.377.1140
+1 352.378.2617

Exactech is providing surgeons with a draft letter to their patients who have been implanted with Exactech knee and ankle devices packaged in non-conforming bags. We recommend surgeons customize the letter and send it to patients implanted with non-conforming devices. Additionally, Exactech is prepared to provide you (1) a list of all your knee and ankle arthroplasty patients who received devices in non-conforming bags, to assist in clinical follow-up efforts, (2) a frequently asked questions page online to assist you, and (3) a tool on Exactech's website that will empower a patient to enter her/his implant serial number and confirm whether or not that implanted device is non-conforming. Knee and ankle patient communication letters should be sent to and discussed with patients as appropriate.  We will contact you separately about your willingness to participate in a voluntary program to provide Exactech with statistics on patient follow-up per a new FDA Patient Science and Engagement Program.

Finally, Exactech has implemented third-party administrator (TPA) services to assist patients with out-of-pocket costs and claims management related to this recall. Information regarding these services can be found on the Exactech website at:  https://www.exac.com/recall.

If it is helpful, we would appreciate the opportunity to set up a conference call/WebEx with you and our corporate leadership team to discuss the issues around this recall, the TPA services, provision of patient lists and management, drafted letters to patients, or any other questions in greater detail. Please correspond with the email address, *packaging-bags@exac.com*, or call us at 1.888.892.5635 if you wish to meet and we will arrange a time as soon as possible.

In conclusion, we would like to reiterate our sincere thanks for your support of Exactech over the years and for taking the time to read this note. We look forward to hearing from you.

Sincerely,

Darin Johnson (Feb 7, 2022 18:24 EST)

Sharat Kusuma (Feb 7, 2022 18:24 EST)

Darin Johnson, President and Chief Executive Officer
Sharat Kusuma, MD, FAAOS, Senior Vice President, and Chief Medical Officer

References

1.    Australian Orthopaedic Association National Joint Replacement Registry: Hip, Knee & Shoulder. Annual Report 2021. Adelaide, Australia: AOA, 2021.
2.    United Kingdom National Joint Registry: 18th Annual Report. Annual Report 2020. United Kingdom: United Kingdom National Joint Registry, 2021.
3.    The New Zealand Joint Registry: Twenty-One Year Report. Annual Report 2020. New Zealand: New Zealand Joint Registry, 2020.
4.    Australian Orthopaedic Association National Joint Replacement Registry: Optetrak-PS/Optetrak Total Knee Investigation 2021. Adelaide, Australia: AOA, 2021.
5.    Australian Orthopaedic Association National Joint Replacement Registry: Optetrak-CR (cemented)/Optetrak-CR (cemented) Total Knee Investigation 2021. Adelaide, Australia: AOA, 2021.
6.    Australian Orthopaedic Association National Joint Replacement Registry: Optetrak-PS/Optetrak-PS Total Knee Investigation 2021. Adelaide, Australia: AOA, 2021.
7.    Australian Orthopaedic Association National Joint Replacement Registry: Optetrak-PS/Optetrak RBK Total Knee Investigation 2021. Adelaide, Australia: AOA, 2021.

CV-2024-02-0508



exactech

2320 NW 66th Court
Gainesville, FL 32653
USA

☎ 352.377.1140
🖶 352.378.2617

**CRYSTAL CLINIC**
ORTHOPAEDIC CENTER

June 7, 2022

SUBJECT:  **KNEE IMPLANT** - Exactech Polyethylene Liner

Dear Patient:

Because the safety and health of our patients is our most important priority, we are writing to inform you that between the years of 2004 and 2022, you underwent a total knee replacement at Crystal Clinic using a specific type of implant that was manufactured by the orthopedic device company, Exactech, Inc., headquartered in Gainesville, Florida. This knee replacement model carries the following name: *Exactech Polyethylene Insert.*

Exactech has recently implemented a recall of one component and insert of this knee replacement device and is communicating with surgeons and patients who have utilized this knee replacement model. During a recent review, Exactech learned that one of the packaging layers for the plastic insert may have allowed oxygen from the air to diffuse into the plastic insert prior to it being implanted. If a large amount of oxygen diffuses into the plastic insert while it's being stored and before it is implanted, this can lead to oxidation that may cause the plastic to wear earlier than expected or become damaged after it is surgically implanted.

Exactech has found that oxidation of the tibial plastic insert can cause premature wear in some patients. Premature wear of this plastic insert can lead to the need for additional surgery (also known as revision surgery). In those cases where the plastic has worn out earlier than expected or has been damaged, we will evaluate your knee replacement and determine whether additional treatment is needed. Determination of whether the plastic is worn is accomplished by examining your knee in the office and obtaining x-rays. After this evaluation is complete, we will inform you if additional treatment, including revision surgery, may be necessary.



**EXHIBIT**

B
_____

As shown in the diagram below, a standard knee replacement has four parts:

1.  The femoral component (this is the metal piece that attaches to the femur or thigh bone )
2.  The tibial tray (this is the metal piece that fits into the tibia or shin bone)
3.  The patellar component (this is the piece of plastic that fits onto the patella or kneecap)
4.  The tibial insert (this is the polyethylene plastic that fits between the femoral component and tibial component and acts as the new cushion or cartilage in a replaced knee joint)



## What happens next:

1.  **If your knee is functioning well and you have no pain and no symptoms, an appointment is not required and revision surgery is not recommended.**

2.  If you are currently experiencing any of the symptoms below, we ask that you make an appointment with your orthopaedic surgeon at Crystal Clinic for an evaluation. Crystal Clinic has a dedicated team to take your call at **1-844-961-5262**. We are available Monday – Thursday from 5pm to 7pm (until the end of June) to schedule an appointment for you within the next few months.  If calling after June 30, please contact your Crystal Clinic surgeon's office directly.

    Symptoms:
    - Knee swelling
    - Pain while walking
    - Inability to bear weight
    - Grinding or other noise
    - Instability or any symptoms of clicking in your knee

3.  During your appointment, your Crystal Clinic surgeon will examine your knee and determine the next steps. If your knee surgeon is no longer with Crystal Clinic, you will be referred to another Crystal Clinic knee surgeon for an appointment.

2

*Tavia Galonski, Summit County Clerk of Courts*

4.  <u>Exactech, Inc., the manufacturer of this knee implant, will cover your expenses, including co-pays and deductibles, associated with this issue which are not otherwise covered by your insurance.</u> Please call Broadspire, which is Exactech's reimbursement administrator, at **1-888-912-0403** to begin this process or if you have any questions.

    a.  Crystal Clinic, on your behalf, will submit your relevant expenses, co-pays and deductibles directly to Broadspire/Exactech for payment, so that you will not have to submit them yourself.
    b.  For reimbursement of co-pays, deductibles and other associated charges *from providers other than Crystal Clinic*, you will need to submit those expenses to Broadspire. Examples of these types of expenses include charges for anesthesia, hospitalists and radiology providers.

5.  If you already received medical treatment related to this issue and incurred expenses, co-pays and deductibles prior to receiving this letter, Exactech will reimburse you. Please call Broadspire at **1-888-912-0403** to discuss this with a representative.

<u>What if I have more questions?</u>

Exactech is committed to patient safety and to providing necessary treatment information. If you have any questions regarding Exactech knee products, please call Exactech's U.S. phone number directly at **1-888-912-0403.**

You may also visit Exactech's website to access Frequently Asked Questions (FAQs) and other information concerning this device and the claims management process:

https://www.exac.com/medical-professionals/product-safety-alert/
(The above link can be accessed via the following web browsers:
Microsoft Edge, Google Chrome, and Apple Safari.
It cannot be accessed using Microsoft Internet Explorer 10.)

The United States Food & Drug Administration has posted information regarding the Exactech Insert at the following website:
https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRes/res.cfm?ID=189266

Please be assured that Crystal Clinic Orthopaedic Center takes these matters very seriously, and we continually strive to exceed our patients' expectations as a premier orthopaedic center of excellence in the United States.

Sincerely,

Sharat K. Kusuma, MD, MBA, FAAOS
Chief Medical Officer
Exactech, Inc.

Daniel Ferry, President and CEO
Crystal Clinic Orthopaedic Center

3

IN THE COURT OF COMMON PLEAS
SUMMIT COUNTY, OHIO

| | |
|---|---|
| PAUL THOMARIOS<br>1 Thomarios Way<br>Akron, Ohio 44321 | ) CASE NO.<br>)<br>) JUDGE<br>) |
| Plaintiff, | )<br>) **INSTRUCTOINS FOR SERVICE** |
| v. | )<br>) |
| EXACTECH, INC.<br>c/o Its Statutory Agent<br>Corporation Service Company<br>3366 Riverside Drive, Suite 103<br>Upper Arlington, Ohio 43221 | )<br>)<br>)<br>)<br>)<br>) |
| and | )<br>) |
| EXACTECH US, INC.<br>c/o Its Statutory Agent<br>Corporation Service Company<br>3366 Riverside Drive, Suite 103<br>Upper Arlington, Ohio 43221 | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

Please serve a copy of the complaint and summons upon each of the defendants by certified mail return receipt requested at the addresses listed above.

Respectfully submitted,

*/s/ Colin P. Sammon*
COLIN P. SAMMON (0076011)
**Sammon Law, LLC**
4931 Shady Brooke Run
Medina, Ohio 44256
Phone: (216) 978-3308
Fax:    (216) 916-4905
Email: colin@sammonlaw.com

*One of the Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served via the Court's

Electronic Filing Service System.

*/s/ Colin P. Sammon*
COLIN P. SAMMON (0076011)

2

**IN THE COURT OF COMMON PLEAS
SUMMIT COUNTY, OHIO**

_____

**CASE NUMBER:**    CV-2024-02-0508

_____

PAUL THOMARIOS vs EXACTECH, INC.


JUDGE:   ALISON E. MCCARTY                    ORDER FILED:    02/01/2024



**NOTICE**
_____


TO:

UNFAIR CONSUMER SALES
c/o Atty. General
30 E. Broad St., 14th Fl
Columbus, OH   43215



**You are hereby notified that the following has been filed with the Summit County Clerk of Courts Office:**

_____

AN UNFAIR CONSUMER SALES ACTION HAS BEEN FILED IN THE SUMMIT COUNTY COURT OF COMMON PLEAS AND ASSIGNED TO JUDGE ALISON E. MCCARTY


_____



February 1, 2024


Tavia Galonski, Clerk
Summit County Clerk of Courts

## IN THE COURT OF COMMON PLEAS, SUMMIT COUNTY, OHIO

CASE NUMBER:   CV-2024-02-0508

PAUL THOMARIOS
1 Thomarios Way
Akron, OH, 44321

-VS-                                                                                    **SUMMONS**

EXACTECH, INC.
Corporation Service Company
3366 Riverside Dr., Suite 103
Upper Arlington,   OH   43221

**TO the following:**

EXACTECH US, INC.
Corporation Service Company
3366 Riverside Dr., Suite 103
Upper Arlington, OH   43221

You have been named as a defendant(s) in a complaint filed in the Summit County Court of Common Pleas, Summit County Courthouse, 205 S. High St., Akron, Ohio, 44308.

A copy of the COMPLAINT is attached hereto.   The name and address of the Plaintiff's attorney is:

COLIN PATRICK SAMMON
4931 Shady Brooke Run
Medina, OH   44256

**You are hereby summoned and required to serve upon the attorney listed above, or upon the party if they have no attorney of record, a copy of an answer to the COMPLAINT within twenty-eight (28) days after service of this summon on you, exclusive of the day of service.   Your answer must be filed with the Court within three days after the service of a copy of the answer on the attorney, or upon the party, if there is no attorney of record.**

**If you fail to appear and defend, judgment may be rendered against you for the relief demanded in the COMPLAINT.**

Tavia Galonski
Summit County Clerk of Courts

February 1, 2024

## IN THE COURT OF COMMON PLEAS, SUMMIT COUNTY, OHIO

CASE NUMBER:   CV-2024-02-0508

PAUL THOMARIOS
1 Thomarios Way
Akron, OH, 44321

-VS-                                                                                          **SUMMONS**

EXACTECH, INC.
Corporation Service Company
3366 Riverside Dr., Suite 103
Upper Arlington,   OH   43221

**TO the following:**

EXACTECH, INC.
Corporation Service Company
3366 Riverside Dr., Suite 103
Upper Arlington, OH   43221

You have been named as a defendant(s) in a complaint filed in the Summit County Court of Common Pleas, Summit County Courthouse, 205 S. High St., Akron, Ohio, 44308.

A copy of the COMPLAINT is attached hereto.   The name and address of the Plaintiff's attorney is:

COLIN PATRICK SAMMON
4931 Shady Brooke Run
Medina, OH   44256

**You are hereby summoned and required to serve upon the attorney listed above, or upon the party if they have no attorney of record, a copy of an answer to the COMPLAINT within twenty-eight (28) days after service of this summon on you, exclusive of the day of service.   Your answer must be filed with the Court within three days after the service of a copy of the answer on the attorney, or upon the party, if there is no attorney of record.**

**If you fail to appear and defend, judgment may be rendered against you for the relief demanded in the COMPLAINT.**

Tavia Galonski
Summit County Clerk of Courts

February 1, 2024